THE PEOPLE, *ex rel.* Fernando Wood, mayor of the city of New York, *vs.* SIMEON DRAPER, JAMES BOWEN, JAMES W. NYE, JACOB CHOLWELL and JAMES S. T. STRANAHAN.

The act to establish a metropolitan police district, and to provide for the government thereof, passed April 15, 1857, was constitutional and valid. ROOSEVELT, J., dissented.

APPEAL from a judgment entered at a special term. The action was brought to try the title of the defendants to the office of police commissioners, which they claimed the right to hold and exercise, by virtue of an appointment by the governor and senate, under the metropolitan police act, passed April 15, 1857. (*Laws of* 1857, *ch.* 569.) The substance of the complaint is set forth in the report of the case at special term, on a motion made by the defendants, to dissolve the injunction. (*See* 24 *Barb.* 265.) In their answer, the defendants alleged, that pursuant to an act of the legislature entitled "An act to

The People *v.* Draper.

establish a Metropolitan Police District, and to provide for the government thereof," passed April 15, 1857, the defendants were severally appointed by the governor of the said state, by and with the advice and consent of the senate, "commissioners of police." That the defendants, on the 20th day of April, 1857, and subsequent to their aforesaid appointment, assembled together, in pursuance of the provisions of said act of the legislature, in the office of the secretary of state at Albany, and drew lots among themselves for the terms of office, as therein prescribed and directed. That upon the conclusion of the said drawing for terms of office, the secretary of state filed a certificate of the result thereof, and gave to each of these defendants the proper certificate of his office, according to the term drawn by him aforesaid, and the said secretary of state then administered the constitutional oath of office to each of the defendants as such commissioners, and made the proper record thereof; and thereby the defendants became, and were, and still are, the chief officers of the said metropolitan police district, and entitled to possess and perform therein the powers and duties authorized and enjoined by the said act. That thereupon the defendants, pursuant to law, notified the mayor of the city of New York, and the mayor of the city of Brooklyn, to meet them at the court of sessions room in the city of New York, on the 22d day of April, 1857, at 3 o'clock in the afternoon, to organize a board of police for the said district, which notices were duly delivered to each of the said mayors, personally. That accordingly, and pursuant to the provisions of the said act, the defendants, at the time and place in such notice mentioned, met together and organized the said board of police, mentioned in said act, and held a first meeting of said board, and thereat elected the defendant Simeon Draper president of said board, and the defendant James Bowen treasurer thereof; and thereby the defendants, together with the mayors of the cities of Brooklyn and New York, *ex officio,* became and were, and still are, a board of police for the said metropolitan police district, and entitled to assume the control of the police force thereof. And the defendants, further answering, denied that

"the office of police commissioner, and member of the board of commissioners of police of the city of New York," and "the office of head of the police department" of the said city, mentioned in the complaint, are now public civil offices in said city, or that they, or either of them, were so at the time of the commencement of this suit. And the defendants also denied that "the office of head of the police department in the city of Brooklyn," mentioned in the complaint, is now a public civil office in the said city of Brooklyn, or that it was so at the time of the commencement of this suit. They also denied that they, at any time, without any legal warrant, or act, or grant whatsoever, intruded into or usurped the several offices of police commissioners or heads of the police department in the city of New York, or head of the police department in the city of Brooklyn; or that they had, for any length of time, unlawfully held or exercised the said office of police commissioners, or head of said police departments, or that they or either of them had unlawfully held or exercised the power or authority which, at any time, was conferred by law upon the board of commissioners of police of the city of New York, or upon the mayor or recorder or city judge of the city of New York, or upon the mayors of the cities of New York or Brooklyn, as the heads thereof, or which relate to, or are in any way connected with the police government, or police appointments, or police discipline, within either of said cities, or within the counties of Kings or New York, or still do so unlawfully usurp or hold or exercise the said several offices of police commissioners, or head of police aforesaid, or unlawfully usurp or hold, or exercise any of the power or authority aforesaid, in contempt of the people of the state, or in violation of the constitution or laws of the said state, or to the prejudice of the said people. And the defendants claimed and insisted, that by virtue of the matters hereinbefore stated, they possessed all the powers and were charged with all the duties authorized and enjoined by the aforesaid act of the legislature, upon the commissioners of police; and from and after the organization of the said board, the defendants have held and exercised, and now hold and exercise, the

offices of police commissioners, and the powers and authorities enjoined upon them by law.

The plaintiffs demurred to this answer. First, on the ground that it did not state facts sufficient to constitute a defense; and second, that the said metropolitan police act was, in whole and in all its parts, repugnant to the constitution, and void. The hearing of the demurrer was had, at a special term, on the 4th day of May, 1857, before Justice CLERKE, by whom judgment was ordered for the defendants, on the demurrer. From which judgment the plaintiffs appealed to the general term.

*S. B. Cushing,* (Att'y Gen.) for the appellants. *First.* The metropolitan police bill, in its whole scope and design, and in every one of its provisions, including the repealing clauses, is manifestly repugnant to the letter and spirit of the constitution, and is consequently void. (*Warner* v. *The People,* 2 *Denio,* 275. *Tims* v. *The State,* 26 *Alabama R.* 165, 170.)

I. Numerous and carefully worded provisions of the constitution, and the unanimous address of its framers to the people, show that a cardinal object of that instrument was " to reduce and decentralize the patronage of the executive government." (*Convention Journal, p.* 1547.)

II. Accordingly, as will appear by the same proofs, "the most important state officers are made elective by the people of the state, and most of the officers of cities, towns and counties, are made elective by the voters of the locality they serve. (*Conv. Jour. p.* 1547.)

III. An examination of the constitution in detail ·will show that this highly approved principle of decentralization was extended to official power as well as to patronage; and that even in the matter of election to office by the people, it was carried to the farthest practicable limit. One single·case, for special reasons, was excepted from the general rule. *Expressio unius exclusio est alterius.* (1.) The senatorial, judicial and assembly districts are created for elective purposes merely, and are not governmental departments in any sense; yet such of them as lie within the limits of a county, which is the largest recog-

nized governmental department, are withdrawn from legislative control, and submitted to the government of the county authorities, i. e. the boards of supervisors. (*Const. art.* 3, §§ 2, 5.) (2.) The legislature is not allowed to alter even those merely electoral districts, except at fixed and distant periods, i. e. on the return of each decennial census. As to senatorial districts, (*Const. art.* 3 § 4;) as to judicial districts, (*Id. art.* 6, § 16.) (3.) It is intimated that the legislature would conform to the spirit of the constitution by conferring upon the " board of supervisors of the several counties of the state, further powers of local legislation and administration." (*Const. art.* 3, § 17.) (4.) So as to the policy of decentralization even in the matter of election by the people. Single senate districts, single assembly districts and small judicial districts are directed. And in respect to counties, cities, towns and villages, their elective officers are to be elected by the locality they serve.

*Second.* The proposition on which the metropolitan police bill is sought to be supported is, that because there are no express negative words forbidding it, the legislature may, for purposes of civil government, lawfully erect " a new and anomalous district unknown to the constitution." (2 *Gray*, 101.) The right thus to circumvent and overreach the provisions of the fundamental law was expressly denied by the supreme court of Massachusetts in an analogous case; if it existed, it would render nugatory the most important features of the constitution. It cannot be admitted.

I. The constitution has recognized all the civil governmental districts of the state, thus giving them perpetuity by a constitutional sanction. They are counties, cities, towns, villages, and divisions of cities, towns or villages. (*Art.* 10, § 2.)

II. The power of selecting most of the principal state officers was vested in the people at large; the power of selecting some of them was vested in the people of districts created in the constitution for this purpose alone. The power of selecting all county, city, town or village officers was vested, mediately or immediately, in the people of such county, city, town or village. (1.) We say mediately or immediately, because

when the officer is not to be elected by the people, he is to be appointed by some "authority" thereof, i. e. some functionary or functionaries of such county, city, town or village. (2.) If the legislature might lawfully give to the central government the power to create and appoint a local appointing power, no change would have been wrought as to local offices by the constitution of 1846.

III. Patronage could be decentralized in no other way than by treating the people of the counties, cities, towns and villages as the original source of power in respect to all local offices.

*Third.* The constitution, by a necessary implication, forbids the legislature to erect for any permanent purpose of civil government, new districts unknown to the fundamental law.

I. If that power existed in the legislature, our cities, towns and villages, with their recognized divisions, might be abolished, and all courts and officers therein also abolished.

III. The newly formed circles, arrondissements, departments or cantons being unknown to the constitution, their tribunals of justice, judges, offices and officers would be wholly unprovided for therein, and all the provisions of the fundamental law regulating the selection of local officers would be inapplicable. Consequently that great mass of patronage which it was intended to withdraw from the central power would be placed in the hands of the governor and his revolutionary legislature as the reward of their usurpation.

III. Under this view of the constitution, the whole judiciary of the state, (except the judges of the court of appeals and of the supreme court,) could be legislated out of office, and a new set of district courts, with judges, clerks and other officers, appointed by the governor and senate, or in any other way the legislature thought fit, vested with their powers and jurisdiction.

IV. So all the functions of local government now exercised by the local officers of counties, cities, towns and villages might be set off in parcels, each parcel having an anomalous district for itself. (1.) Police in a district of four counties. (2.) Lamps and gas in a district of two counties. (3.) Paving and regulating streets, &c., in a district of a city and a half, and so on to the

end. The local officers for all these purposes of local govern‑ ment might, of course, be appointed by the legislature itself, or by any one whom it saw fit to vest with the appointing power.

V. There is not a negative word in any of the provisions of the constitution touching these subjects. But unless a pro‑ hibition shall be implied numerous provisions of the constitu‑ tion are ineffectual and nugatory.

*Fourth.* The judgment given at special term should be re‑ versed and judgment of *ouster* entered.

*D. D. Field, J. M. Van Cott* and *W. M. Evarts,* for the respondents. *First.* The "Act to establish a Metropolitan Police District, and to provide for the government thereof," passed April 15, 1857, is constitutional.

The power to pass the act belongs to the legislature, upon the general principles of political society, and the constitution has so left it. (*Const. art.* 3, § 1.) It is not necessary to deny that there are certain permanent *political divisions* of the state, and that they must continue, for the purposes for which they were constituted, until changed in conformity with the or‑ ganic law. But it does not follow, that other divisions may not be created by the legislature for other and special purposes. All that the defendants need maintain, is, *that some laws may be local in their operation, and that neither their operation nor administration is necessarily co-extensive with, or limited by, either of the general political divisions.* The constitution makes the government central for certain declared purposes ; makes local divisions for certain other‑declared purposes of government ; and, beyond the purposes so declared, the legis‑ lative sovereignty is left to invest the central power and the local authorities with such a share of power as it sees fit to delegate, and to provide how, and by whom, the delegated powers shall be executed.

Government in this state is thus administered, (1.) By the central power, through the three great departments,—legislative, exec‑ utive and judicial ; (2.) By the local divisions, *to the extent and for the purposes specified in the constitution,* and as, from time

to time, enlarged and permitted by the legislature ; and (3.) By such local districts, officers and political functions, as the legislature designates for certain special purposes, in executing the great trust of government. (4.) The great mass of legislative power remains in the legislature, diminished only by the exceptions of the constitution. Decentralization is but a deduction from the mass of the central power. The new police act does not disturb either of the great departments, or the political divisions of the constitution, but leaves them, and leaves the *constitutional purposes for which they were created,* intact. The divisions, officers, functions, elections and appointments, remain as established by the fundamental law. The instances and illustrations of the power to create new offices, *and new spheres of duty,* and to fill them otherwise than by local election or appointment, are very numerous, ex. gr. : (1.) Acts by which the legislators have appointed commissioners, naming them, creating their offices, and defining their duties : Of the laws of 1847, (*chs.* 24, 41, 122, 140, 145, 169, 266, 285, 342, 433 ;) of the laws of 1848, (*chs.* 310, 88, 43, 358 ;) of the laws of 1849, (*chs.* 3, 172, 354 ;) of the laws of 1850, (*chs.* 36, 249, 252, 271 ;) of the laws of 1851, (*ch.* 50.) Also the following acts : (2.) Act authorizing the governor, by and with the advice of the senate, to appoint Hell Gate pilots, 1847. Authorizing the superior court of the city of New York to appoint commissioner to open Washington Park in Brooklyn. (*Ch.* 142, *Laws of* 1847.) Commissioners of emigration act. (*Laws of* 1847, *ch.* 197.) Act increasing number of harbor masters, and providing for appointment. (*Laws of* 1848, *ch.* 2.) Auditor of canal department. (*Laws of* 1848, *ch.* 162.) State reporter. (*Laws of* 1848, *ch.* 224.) Wreck masters, fifteen in Suffolk county, twelve in Queens county, three in Kings county, two in Richmond county, two in Westchester, to be appointed by the governor, &c. (*Laws of* 1848, *ch.* 343.) Physician to marine hospital. (*Laws of* 1848, *ch.* 350.) Harbor masters increased and provision for appointment. (*Laws of* 1850, *ch.* 72.) Commissioners to build a court house in Oneida county, and named in the bill ; a counterpart of the city hall act. (1851, *ch.* 49, *p.* 57.) Commis-

sioners to build a bridge over the Clyde river, town of Lyons, and named in the bill. (*Laws of* 1851, *ch.* 101, *p.* 183.) "An act appointing commissioners to lay out a public highway in the towns of Westmoreland, Vernon and Verona, in the county of Oneida." (*Laws of* 1851, *ch.* 273, *p.* 548.) Commissioners to re-survey a public highway in Monroe county. (*Laws of* 1851, *ch.* 373, *p.* 725.) "The governor is hereby authorized to appoint in and for the city and county of New York twenty-five additional notaries public." (*Laws of* 1851, *ch.* 390, *p.* 770, § 1.) Ditto as to the city of Troy. (*Laws of* 1851, *ch.* 476, *p.* 873.) "An act for the appointment of commissioners of record for the county of Kings." (*Laws of* 1856, *ch.* 190.) This names commissioners and obliges supervisors to defray their expenses by tax.

Each of these statutes is obnoxious to the general speculative objection against the centralization of power ; most of them make a sphere not identical with any political division, and all of them fill the offices they create, otherwise than by local election or appointment. They show, that while abstract and speculative reasonings are seductive and specious, they are unsafe guides to judicial administration.

*Second.* The general purpose imputed to the constitution, to decentralize power, is not in conflict with the act. The extent of that purpose, and the manner in which it is to be executed, are defined by the text of the constitution itself. It makes the great states officers elective by general ticket, It makes the entire legislative force of the state elective. It makes the entire judicial force of the state elective. It makes all the *enumerated* county officers elective, and all county and town officers not enumerated elective, except as the legislature may direct them to be appointed by the local authorities. It leaves all village and city officers to be elected at large or by divisions, or appointed by local authorities, as the legislature may direct. Here the purpose of decentralization stops. The constitution so far declares its will, and provides for its execution, in the disposition of offices ; all beyond it leaves absolutely to the will of the legislature. "All other officers whose election or appointment is not provided for by this constitution, and all officers

The People *v.* Draper.

whose office may hereafter be created by law, shall be elected by the people, or appointed as the legislature may direct. (*Const. art.* 10, § 2.) The effect of all this is : (1.) To make certain offices elective by the whole state. (2.) To make others elective in judicial, county, town, city, and village districts, and divisions. (3.) To fill others by local election or appointment, as the legislature may deem best. (4.) To leave all others then existing, and not so provided for ; and all others the legislature might thereafter create, to the sovereign discretion of the legislature. The purpose of the constitution to decentralize power has been greatly overstated. The great legislative department is a central power. The great judicial department is a central power, with unimportant exceptions. The executive power remains central, except as the constitution has to a partial extent, and the legislature may to a further extent, decentralize it. So far as it reaches, the principle of decentralization applies equally to local offices and to those not local. The principle not being universal, its effect in each particular case must depend upon the terms of the constitution and upon particular rather than general reasons. Our construction, as explained and limited, does not and cannot subvert the policy of the constitution. It only leaves to the legislature that part of the sphere of official creation which the constitution has not itself pre-occupied.

*Third.* The officers provided for by the new police act, are not county, town, city or village officers. They cannot (in the sense the relator contends for,) belong to more than one division ; they do not necessarily belong to either. They are not in the category of local officers enumerated in the constitution. They are not officers of a political division, merely because they perform duties within it, or because the locality takes a benefit from the duty. Treating the political divisions as corporations or *quasi* corporations, a local officer in the sense of the constitution, is one who is a part of the organism, and by whom the corporation speaks and acts. Subject to the constitutional limitations upon the legislative power, the dimensions of a city, its divisions, its share in legislative and executive func-

tions, and the mode in which it shall exert them, depend absolutely upon the legislative will. "It shall be the duty of the legislature to provide for the organization of cities and villages." (*Const. art.* 8, § 9.) The power that creates an artificial being, necessarily determines its functions. The state may withhold particular power from a corporation; *a fortiori*, it does not abdicate any power it chooses to share with such a corporation. It may resume any of the powers delegated; it may admit the municipality to a large or small share of the power, and it may exclude it altogether. The power of exclusion applies to police no less than to other governmental powers. What is a police power? The following statutes and decisions show the great variety and large scope of police powers, and demonstrate that they are not cast in the mould of the political divisions of the state, viz: See 4 Bl. Com. ch. 13; "Offences against the public health and the public peace or economy." 2 R. S. 881, title *Misdemeanors.* 1 Id. 848, title, "Regulations for the preservation of public health." Id. 818, "Quarantine," in the port of New York. 2 Id. 6, "Of the Internal Police of the state"— 21 titles. Charters and ordinances of cities, for the prevention of fires. 2 R. L. 1813, p. 368, § 1; p. 369, § 83, for destruction of buildings to prevent spread of fire. (*The Mayor* v. *Lord,* 18 *Wend.* 126. *Russell* v. *The Mayor,* 2 *Denio,* 461. *Commonwealth* v. *Sessions of Norfolk,* 5 *Mass. R.* 437. *Same* v. *Sessions of Middlesex,* 9 *id.* 388.) Laws regulating intramural burials, &c. (*Stuyvesant* v. *New York,* 7 *Cowen,* 588. *Vanderbilt* v. *Adams, Id.* 349. *Commonwealth* v. *Dana,* 2 *Metc.* 329. *Baker* v. *Boston,* 12 *Pick.* 184. *Commonwealth* v. *Tewksbury,* 11 *Metc.* 58, 59. *Same* v. *Alger,* 7 *Cush.* 86. *Preston* v. *Drew,* 33 *Maine,* 560.) And see *Corporation of New York* v. *Miln,* (11 *Peters,* 102,) where the subject of police regulations was largely considered. (*The license cases,* 5 *How. U. S. Rep.* 504.) Where, in the constitution, is the model, definition or limitation of police districts or police powers? What reason is there for saying that a police district shall not be smaller than the whole state, or not larger than a county, town, or city? If it may be smaller than

the state, or larger than a city, town, or county, the adverse argument falls; and equally so, if the whole police power may be exerted as a unit by the state government.

*Fourth.* The office of police commissioners has been created by the legislature since the constitution was adopted, and the mode of filling it is expressly left to the legislature, (*art.* 10, § 2,) and the police commissioners are constitutional local authorities to appoint policemen.

*Fifth.* The relator is without title to the office, on the ground that the new law, (1857,) is constitutional, or that the old law, (*Laws of* 1852, *ch.* 228,) is unconstitutional. He was not elected a police commissioner. He was not appointed by any local authority. If to be a police commissioner is an *office*, a *person* must be elected or *appointed* to fill it—attaching it *ex officio* to another office would not be to elect or appoint, but would be a mere evasion. And if it is not an office *per se*, a *quo warranto* will not lie to oust an intruder and admit the relator. If the office is that of mayor, or recorder, or city judge, it is an answer to the action that the defendants are not alleged to have intruded into the office of mayor, city judge, or recorder.

*J. W. Edmonds*, in reply. - I. Where a statute is in violation of the constitution, it is in the power, and is the duty of the courts to pronounce it void, and redress an act already done, or prevent a contemplated one, as the nature of the case may require. (1 *Kent's Com.* 448, 453. *Taylor* v. *Porter*, 4 *Hill*, 144. *Newell* v. *People*, 3 *Seld.* 97, 99, 109, 119. 1 *Story on Const. ch.* 4. *People* v. *Cowles*, 3 *Ker.* 360. *Wynehamer* v. *People*, *id.* 386.)

II. This principle has become so thoroughly incorporated into our judicial system, and so frequently acted upon, that certain canons of construction have been adopted for the government of such cases; among them are the following: (1.) The constitution is to be construed according to the sense of the terms and the intention of the framers of it. (1 *Story on Const.* § 400.) (2.) It is to be construed according to its nature and objects, its scope and design as apparent from the

structure of the instrument as a whole, and also viewed in its component parts. (1 *Story on Const.* § 405.) (3.) In construing it, much may be gathered from contemporary history, and contemporaneous interpretation. (*Stuart* v. *Laird*, 1 *Cranch*, 299. *Martin* v. *Hunter*, 1 *Wheat.* 304. *Cohens* v. *Virginia*, 6 *id.* 264, 418.) (4.) It is to receive a reasonable interpretation of its language and its powers, keeping in view the objects and purposes for which those powers were conferred. (1 *Story on Const.* § 419. *Ogden* v. *Saunders*, 12 *Wheat.* 332.) (5.) Where power is granted in general terms, it is to be construed as co-extensive with the terms, unless some clear restriction is deducible from the terms. (1 *Story on Const.* § 424. *Sturges* v. *Crowninshield*, 4 *Wheat.* 122.) (6.) No construction of a given power is to be allowed, which plainly defeats or impairs its avowed objects. (1 *Story on Const.* § 428. *Gibbons* v. *Ogden*, 9 *Wheat.* 188.) (7.) In the interpretation of a power, all the ordinary and appropriate means to execute it are to be deemed a part of the power. (1 *Story on Const.* § 430. *McCullock* v. *Maryland*, 4 *Wheat.* 316.) (8.) If a power to create is given, it implies a power to preserve. A power to destroy, if wielded by a different hand, is hostile to, and incompatible with, the power to create and preserve; and when such repugnancy exists, the authority which is supreme must control. (1 *Story on Const.* § 440. *McCullock* v. *Maryland, supra.*) Consequently the inferior power becomes a nullity. (*Sturges* v. *Crowninshield, supra.*) (9.) Where such repugnancy exists, it is no answer that each may avoid collision; the objection lies to the power itself, and not to the exercise of it. (1 *Story on Const.* § 447.) (10.) That is the truest exposition which best harmonizes with its designs, its objects and its general structure. (1 *Story on Const.* § 455.) (11.) Whenever the terms in which a power is granted require its exclusive exercise by one body, the subject is as completely taken from another, as if that other had been expressly forbidden to act. (*Sturges* v. *Crowninshield, supra. See, generally on the rules of interpretation*, 1 *Story on Const. book* 3, *ch.* 5.) (12.) A power forbidden by necessary and unavoidable implication is as

much forbidden as if forbidden in express terms. (*Barton* v. *Himrod*, 4 *Seld.* 489. *Thorne* v. *Cramer*, 15 *Barb.* 118. *Bradley* v. *Baxter, id.* 125, 7.)

III. The act in question is void for two reasons : (1.) Because it provides for an unconstitutional mode of appointing local officers. (2.) Because it invades private property without just compensation.

*First. As to local officers.* This act provides for the appointment of police officers and clerks, which have ever been local officers, by a board of commissioners, and not, as required by the constitution, by the electors of the city, or some authority of such city. (*Const. art.* 10, § 2.) (1.) The commissioners appointed under the act are in no sense within the meaning of the constitution, an authority of the city. They are an authority of a district comprising four counties. (2.) This is in violation of the constitution, and void. (3.) The whole scope, object and design of the constitution was to decentralize power, viz : Senators, once chosen in four or eight districts, are now chosen in single districts. (*Art.* 3, § 3.) The assemblymen are in like manner chosen in single districts. (*Art.* 3, § 5.) The state officers are chosen by the whole people, and not by the governor or legislature at the seat of government. (*Art.* 5, § 1.) Legislative powers are taken from the same center and conferred on county supervisors. (*Art.* 3, § 17.) Even the judiciary is divided into eight provincial courts, instead of one general court. And most of the appointing power once exercised at the center, is now diffused throughout the state, either by general elections or local appointments. (4.) Besides this general design of the constitution, the particular provision as to local officers is in conflict with this statute. (*Art.* 10, § 2.) The convention had in plain view the making of appointments in police departments, a local matter. The convention appointed two committees, one for general officers and one for local. It called from the secretary of state a list of local officers, among whom were enumerated policemen. The committee on local officers reported their local appointments, or election to office, and gave their reasons. The section they rec-

ommended to carry out their views, was adopted without alteration. And now, for ten years immediately following the adoption of the constitution, it has been so done. It is thus plain, from the avowed intention of the convention, and the contemporaneous interpretation, what was intended, as to those who were then city, village or town officers. (5.) This plain intention cannot be evaded or violated by any legislative act merely 'making them officers of a larger district. There is no new office created by this statute. There is now in this city, under existing laws, a board of police commissioners, a chief of police, captains, assistant captains, sergeants, policemen and doormen; station-houses, police duties defined, compensation provided, provision for appointments and removals, and general superintendence. If the legislature can thus evade that provision in the constitution, then these things must follow: 1. It cannot matter how much territory is included in the new district: a few feet will be as good as so many acres or miles. 2. By mingling two cities or towns together, the power of electing all municipal officers may be taken from the people and be given to the governor. 3. So all local judges may be thus appointed, instead of being elected. 4. So, by barely joining two counties together, or only parts of them, sheriffs, clerks, surrogates and district attorneys, may be thus appointed and not elected. 5. In fine, by making all county or city officers with the same names and powers of a larger or smaller territory, they could be appointed by the central power, and not be elective, as now. 6. There is no officer that is now exclusively a city or county officer, that may not be made an officer of a larger or smaller territory, and thus have the constitutional mode of his appointment changed, if this statute shall prevail. 7. It is not intended to deny the right of the legislature to alter the territorial limits of counties, cities and towns, but that power must be exercised in subordination to the provisions of the constitution, as to the mode of appointments to office and the like. 8. When this power to alter territory is so exercised as to interfere with this provision of the constitution, it must yield to the supremacy of the fundamental law. ( *Warren* v. *Mayor of*

The People *v.* Draper.

*Charlestown,* 2 *Gray,* 84.) 9. The means cannot be so converted into an end as to change the whole character of the act. (*McCullock* v. *Maryland,* 4 *Wheat.* 316.)

· *Second. As to taking private property.* (1.) Section 15 of this act gives to the use of the new commissioners all the public police property, &c., now provided, in this city, for the police, and which is the private property of the city. (2.) The provision as to the ownership of the property and the regulation of its use by the common council, is subordinate to the possession, which is given absolutely to the commissioners. (3.) This is in every aspect in violation of the constitution, and no compensation is provided for it.

IV. The main scope and object of the statute being thus in violation of the constitution, it must fall as void. ( *Wynehamer* v. *People,* 3 *Kern.* 386.)

MITCHELL, P. J. In the argument of this case there was scarcely any (if any) difference of opinion as to the rules by which the constitution of our state is to be interpreted. The rule under the federal constitution is inapplicable. That instrument was framed with the view to confer only certain defined and limited powers on the general government. General legislative power was not given to congress, but special powers only, and those carefully enumerated in seventeen subdivisions. This alone would have limited it to those enumerated powers, and such as were necessarily implied from them ; but so jealous were the people at that time, of the federal government, that among the amendments proposed at the first session of congress, under the constitution, and afterward adopted, was the one declaring that " the powers not delegated to the United States by the constitution, nor prohibited by it to the states, were reserved to the states, respectively, or to the people." The reverse rule applies to the state legislature. There must be some body in which a power of legislation shall reside, competent to meet all the varied and changing wants of the community, and unlimited, except by such restrictions as may be specially named. He, therefore, who would sustain the power

of congress to do any particular act, must find in the constitution of the United States the clause which gives the power; but when a law is passed by the state legislature, it is to be presumed valid until some clause in the constitution of the state is pointed out which forbids it.

The language of the state constitution leads to the same result. It is that "the legislative power of this state shall be vested in a senate and assembly." This alone includes all power of legislation, without restriction, except such as is found in the same instrument, or results from the higher authority of the federal constitution and of congress, in certain cases. This restriction on the power of the legislature may be either express, as in the prohibition to sell the canals or the salt springs, or to give or loan the credit of the state, and in other instances, or it may be implied, as when it is declared that the executive power shall be vested in a governor, the legislature cannot take away that power from that officer, or vest it in another. So when it is declared that "sheriffs, clerks of counties, including the register and clerk of the city and county of New York, coroners, and district attorneys, shall be chosen by the electors of the respective counties," no act of the legislature can sanction another mode of election or appointment to these offices.

And accordingly, it cannot be and was not disputed, that the clauses providing that " all county officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties, or appointed by the boards of supervisors, or other county authorities, as the legislature shall direct," and that " all city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose," (art. 10, § 2,) by requiring such officers to be appointed or elected by the local authorities, negatived the power of the legislature to prescribe any other mode of election or appointment; and it would follow, if the officers appointed un-

The People *v.* Draper.

der the act now under consideration are, as the plaintiff contends, county officers, and do not come within the next clause of the same section of the constitution, that their appointment is void.

That section is as follows: "All other officers, whose election or appointment is not provided for by this constitution, and all officers (or all other officers) whose office may hereafter be created by law, shall be elected by the people, or appointed, as the legislature may direct." This clause expressly re-establishes in the legislature full power to direct the mode of appointment of all officers whose election or appointment is not provided for by the constitution; and also of all or all other officers whose offices should be thereafter created by law. If the police commissioners are not county officers, or if the offices which they fill have been created since the constitution took effect, and did not exist before, the legislature had unquestionable power to direct the mode of their appointment as it saw fit. Whether the law be expedient or inexpedient, the judiciary cannot inquire, but must obey it as all other citizens must. Thus far, there is probably no diversity of opinion.

It was said, on the argument, by one of the counsel, but not pressed, that the police patrolmen were to be appointed so that certain persons among them should be the police for the city of New York, certain others for Kings county, certain others for Richmond, and certain others for Westchester county, and hence it was argued that the police were county officers. But the act is not so; it creates one metropolitan police district, consisting of those four contiguous counties, and creates five commissioners of police, who, with the mayors of the cities of New York and Brooklyn, constitute a board of police, and authorizes this board to appoint a superintendent of police and police patrolmen and other officers, "for the whole of the said metropolitan police district, and authorized to do duty in any part thereof, without regard to residence or county lines."

All that is local about the force is, that the board of supervisors of the county of New York is to determine how many shall be appointed as a quota of the patrol force, to be paid

for by said county; the common council of Brooklyn, how many shall be appointed as a quota to be paid for by that city; the supervisors of the towns of Kings, except those of Brooklyn, how many shall be appointed as a quota to be paid for by those towns, and the supervisors of Richmond and Westchester, respectively, how many shall be appointed as a quota for those counties, and to be paid by them, respectively. But the whole control of the whole police force, the designation of the persons to act in any part of the district, and of the number so to act, and the times and places when, is under the control of the board of police, and of their superintendent and other officers appointed by it. (§ 6.) The district is to be divided into precincts, without regard to county or ward boundaries, and one inspector or captain of police and four sergeants, are to be assigned to each precinct. (§ 10.) They may be assigned, from day to day, or from month to month; they are not appointed for a particular precinct; they, like military officers, are assigned to a particular station, to remain there only so long as the head of the department may see fit. Each county is to furnish its quota of the fund necessary to pay the body of police, but is not to pay it to or for any particular part of that body, but it all passes into the treasury of the state, and is thence to be disbursed for the general purposes of the act. (§ 27.)

It is true that the duties to be performed by this police force have heretofore been performed through county, town or ward officers. But there is nothing in the constitution which prevents the legislature, in its sound discretion, from transferring the performance of those particular duties from one class of officers to another. At common law, and at the time of the adoption of this constitution, in most, if not all the counties, the sheriff was, in some sense, head of the police, and it was his special duty to preserve the peace. He is an officer who is recognized by the constitution, and whose election is there specially provided for, yet that part of his duties could unquestionably be taken from him, and be performed by others, as by the mayor of a city, or the head of police. Nor does the constitution declare, or necessarily imply, that all the duties which

The People *v.* Draper.

had formerly been part of the duties appertaining by the law, as it then stood, to a particular office, should always remain either as appurtenant to that office, or to some other office of equally limited local extent.

The office of sheriff could not be stripped of all its duties, and those duties be all transferred to another officer; but this implied prohibition applies as well to a new officer, whose power should be limited to a single county, as to a new officer whose power should extend over several counties. In neither case could a transfer be made of all the duties; and it is as much within the competency of the legislature to make a partial transfer of those duties to officers who shall have control over several counties, as it is to make it to one who shall be limited to a single county. The language of the constitution was not adopted, by the framers of the constitution, without discrimination as to the words they used. It is that "all county officers, all city, town and village officers," shall be elected or appointed, &c., by the local authorities. It is not that all the duties theretofore performed by these officers, shall be thereafter performed by county officers. But, knowing and intending that the legislature should regulate the duties of officers as it should find expedient, from time to time, the framers of the constitution left to the legislature unrestricted power in that respect. It might be that the conductors of rail roads would become so negligent of the safety of passengers, that fines and penalties would not be a sufficient means of protection, and it would become necessary to have a public officer accompany each train, to see that the needful regulations were observed. It might also be that the property carried on these roads would be so frequently stolen that it would be expedient to have an officer attend each freight train. If so, it would become the duty of the legislature to afford that means of protection to the citizen and his property; and the most effectual means of accomplishing it might be to organize a police force, to be appointed by commissioners, with superintendents under them; and it would be necessary to appoint them not for a single county, nor by the local authorities, but by some body of men who should have

control over the whole route of the road, as for the Erie road, or our great Central road, or the Hudson River road, or the Harlem and Albany road. A similar necessity might arise on our canals. River thieves, on the waters around and in the vicinity of the city of New York, have long been complained of. They may extend their depredations, (and it is said they have,) to the neighboring counties. An ordinary police force is inefficient against them. The most efficient means to overcome them might be a force of men appointed for New York and its neighboring counties, with one head, and equal power in every part of the district. The constitution shows no design to cripple the legislature of its power of affording such a remedy.

In all these cases the force would be, as this is, a police force; yet, it would not be unconstitutional, although the officers were not appointed for, or by local authorities. The poor were at one time supported by towns, and the overseers elected or appointed for those towns. The responsibility was, in some cases, shifted from the separate towns to the whole county. As yet, it has not been extended further, as a general rule. Can it be, that if it should become expedient, in some instances, to constitute two or more counties into one district for the poor of those counties, and to have the overseers elected or appointed for the whole district, this could not be done ? If the power may be exercised in any of these cases, then officers, for new districts, composing several counties, although performing duties formerly performed by officers of counties and towns, " are officers whose offices are created after the adoption of the constitution," within the meaning of that instrument, and they may be elected by the people, or appointed as the legislature may direct.

Then, in this case also, these being officers for districts not before known, although performing duties formerly performed by county or town officers, may also be appointed as the legislature has directed. The illustrations that have been produced, (and more might be furnished, and others are referred to in the defendants' points, in acts already passed,) show that there

The People *v.* Draper.

were good reasons why this power should have been allowed to the legislature, and that it is thus within the probable intent of the constitution; and as the power is within the express and literal words of the constitution, which applies to all offices thereafter created and this office was thereafter created, it follows, that the letter and spirit of the constitution concur in sustaining the law now under consideration.

The journal of the convention which framed the present constitution, and the address made by the members of that body, have been referred to, to prove that a cardinal object of that instrument is " to reduce and decentralize the patronage of the executive government;" and that, accordingly, in the language of that address, " the most important state officers are made elective by the people of the state, and most of the officers of cities, towns and counties are made elective by the votes of the locality they serve." The address thus speaks of the constitution as it is, and refers to it to show in what instances this principle is carried out—and speaks of it as a limited, not an unlimited, principle; it applauds the constitution, not for any implied restraint which it contained on the power of the legislature to elect new officers and to control the mode of their appointment, whether by the governor and senate or by districts or localities—but for the clear and unambiguous provisions by which it was expressly declared that certain officers who were named in the constitution should be elected or appointed by the local authorities. It referred to those thus named, and called on the people for approbation of their labors, because those special provisions were made, not under the idea that, having provided for some cases of decentralization, they had thereby infused into the constitution a spirit which must extend it to others. They accordingly distinguish, and in the clause last quoted, speak not of all, but of most of the county, town and city offices, and of their being elective. The framers of the constitution, in specifying the instances to which this principle was applied, acted on the wise rule of changing the elemental law in particular cases, the effect of which was plain to their perception—not on some broad theo-

retical idea, whose extent, with its consequences and results, must be left to time or chance to discover. The appointment of officers for districts larger than counties, they left at large to the legislature, in the confidence that in a republic the people may rely with safety upon a legislature one part of which is annually elected, or will have the remedy in their own hands at a succeeding election.

It is said that the law attempts to transfer the police property belonging to the cities of New York and Brooklyn to the new board of police, (§ 15.) If it did, that would not avoid the whole act. The section (15th) in which this supposed transfer is made is a distinct and separate one, and may be rejected and yet the rest of the act be effectual. The case of *Warren* v. *The City of Charlestown*, (2 *Gray*, 101,) states a sensible rule, which is, substantially, that when the parts of an act are so blended together that the unconstitutional part cannot be struck out without thereby leaving the act in such a condition that it would defeat the intention of the legislature—or when the unconstitutional part was manifestly the very object of the law, there the whole must fall together. So it would follow here, that if all this law be unconstitutional except the part repealing statutes inconsistent with it, that repealing clause must fall also. But the section as to property is a comparatively unimportant part of the act. Its great object evidently is to obtain a new and efficient organization of police for the new district. The 15th section, however, expressly declares that the ownership of the property referred to, and the use of the same, shall be according to the ordinances of the common councils of the two cities respectively. If that property is held by those cities under an obligation or trust to allow it to be used for police purposes, it may well be that any police force that may be acting for the benefit of those cities may be entitled to such use of them.

The judgment of the special term in favor of the defendants, should be affirmed, with costs, to be paid by the relator.

PEABODY, J. The claim of the plaintiffs herein is, that the defendants have usurped the offices of police commissioners,

The People *v.* Draper.

and are exercising the powers of those officers in certain territory of the state, in violation of law, and they ask to have them ousted therefrom by the judgment of this court. They also ask to have the relator adjudged entitled to hold the office of such commissioner, which he did hold until removed by the usurpation of defendants. The defendants answer, that, pursuant to an act of the legislature of the state of New York, passed April 15, 1857, entitled, " An act to establish a Metropolitan Police District, and to provide for the government thereof," they were, by the governor, with the consent of the senate, appointed commissioners of police, and thereby became and still are authorized to perform the duties enjoined by said act. To this answer the plaintiffs demur, and to sustain their demurrer rely on the unconstitutionality of the act. They say that the act, in its general scope and effect, is at variance with the spirit and purposes of the constitution.

First. That it is so, in creating a new district or division of the state, unknown to the constitution, for governmental purposes.

Second. That it conflicts with the spirit of decentralization which pervades the constitution, in conferring on the executive of the state the power of appointing commissioners to these offices, comparatively local in their character.

Third. That the act is unconstitutional in giving to the use of the commissioners, the police property of the city of New York, which, it is said, is the private property of the city.

By this act the counties of New York, Kings, Richmond and Westchester are constituted a " Metropolitan Police District," and the governor, with the consent of the senate, is authorized to appoint five commissioners to the offices held by the defendants, whose duty it shall be to take charge of the police of said district, appoint and remove members of the corps, and generally to take entire control and direction of the administration of police throughout the territory constituted such police district. This law erects, it is said, a new governmental district unknown to the fundamental law. The constitution having recognized all the civil governmental districts of the state,

gave them, it is argued, perpetuity by its sanction, and by necessary implication forbade the legislature to erect for any purpose of civil government permanent districts unknown to it.

The constitution does, it is true, recognize certain governmental districts of the state as then existing. It does this incidentally more than once. It does no more than recognize them, however. It does not erect or expressly sanction them. They existed prior to the constitution, and were not disturbed by it, but were suffered to remain as they had been theretofore. The constitution, therefore, has had nothing to do with them, or the fact of their existence, except silently to tolerate them, and perhaps provide for the alteration of some of them, under certain circumstances. These districts are counties, cities, towns and villages. They existed prior to the constitution, and were by it left, without other sanction than what may be implied from expressions no more significant of it than mere reference to them by generic terms in the distribution of the powers of government. Nothing in the mode of reference indicates that they must remain as they were, or that they may not be altered in their form or extent, or that the territory which then constituted one of these districts was expected to continue to do so. On the contrary, as to some of them, the power to alter them is recognized in that fundamental law ; and as to the others, there is nothing on the face of that instrument to suggest the impropriety or impracticability of alterations.

But suppose that it had enacted, and so created these districts of the extent and proportions they now possess; and suppose it had gone further, and ordained that they should remain intact and as they were made, until altered or abolished by some power of equal dignity with that which created them, and that no such alteration had been made ; when for some purpose, to acquire some benefit or avoid some evil common to two or three or four of them adjacent to each other, they unite, or are united in a legislative enactment, for that single purpose—to supply a want peculiar to the particular section of territory embraced in them—would such a law be invalid, as violating

the spirit of the constitution, by infringing those divisions, they being, as in the present case, recognized in it as existing for general governmental purposes ? The four counties embraced in this district are certainly peculiar, in embracing and lying contiguous to the great metropolis of the western hemisphere. From this circumstance, if no other, they must have wants and interests peculiar to themselves and common to them all. Their situation in this respect, it is apparent, must call for an administration of police which would be quite unnecessary and inexpedient in most, and perhaps in all other parts of the state. The counties, as such, are not dissolved. As counties they still exist for all general purposes, and the governmental departments sanctioned or recognized by the constitution are not violated, but remain in their integrity. A law applicable to the territory embraced in four of them is made to supply a want at once common and peculiar to them alone, of all the state. Indeed, as the constitution recognizes the divisions of the state into counties, and is said thereby to have sanctioned them, so does this act recognize the districts of territory embraced in these counties, respectively, as constituting those governmental departments, and in this respect it may be said, in some sense, to lend its sanction to their existence, for the purposes for which they were created, certainly to refrain from any disintegrating invasion of them.

Suppose some other local subject of legislation to exist in several contiguous counties—a valuable fishery, for instance, which required legislation for its preservation or management—it would hardly be claimed (as is claimed here) that a legislative enactment on that subject, applicable to those counties alone, was hostile to the spirit of the constitution, because it was so applicable to more than one county and less than the whole state ; that the territory embraced in it was thereby made a governmental district of the state, inconsistent with, because not sanctioned by, the constitution. But we are unable to see why it might not be claimed with equal propriety.

This act provides a system of police administration for a certain section of the state, in which the legislature have decided

that a peculiar system was required. We see nothing more than this in the act pertinent to the objection we are now considering. The fact that the section of country thus provided for lies in one or more counties, or embraces the whole of a county, or more than one, cannot, we think, be important in determining the question raised by this point. It is not pretended that there is any thing expressed in the constitution inconsistent in this respect with the act in question. The claim of the plaintiffs is only that the constitution, having recognized, and thereby sanctioned certain governmental divisions, counties, towns, cities, villages, &c., other divisions for governmental purposes are inconsistent with its intent, unauthorized, and by implication, forbidden by it. This argument would seem to have more force, if the constitution had assumed to divide the state for general purposes of administration, either by declaring new or expressly ratifying the old districts. It might then be argued with more force, that the people, with whom is the sovereign power, by their convention had entered on that field of duty, and having established or declared certain divisions of their territory, must be held to have exhausted the subject by making or declaring all the divisions they deemed expedient, and that a negative or restriction on the power of their humble servants, the legislature, was thence to be inferred. But this they have not done. The constitution does not enter on that field of labor at all, either to originate divisions or declare those already made. It does not take up the subject for treatment, or treat it at all; and the fact that in the distribution of powers by it, certain powers of local administration are conferred on these divisions, and the divisions in that manner recognized, and perhaps sanctioned by it, is not sufficient to authorize the inference of a restriction from making any other divisions not in their own nature positively inconsistent with those existing.

But we are unable, in any view of the subject, to consider this act as creating a new governmental district of the character which would be inconsistent with any general division of the state. Those divisions are for general governmental pur-

The People *v.* Draper.

poses. A county, for instance, is a quasi corporation, and as such has many powers of self-government. It is one of several divisions of the same character, all of which, taken together, make up and compose the state. They are members, so to speak, of the state. A county is an attribute or feature of the state. It has, by virtue of its own character, inherently, many classes of powers. Many of the attributes of sovereignty by our law are vested in counties as such. The division of the state into counties is not for any one purpose, or any particular number or class of purposes. It is for the general purposes of government. The origin and history of this governmental division, as well as modern legislation, have given to the term a definite meaning ; and wherever the jurisprudence of a country is derived from the common law, the term is believed to be in familiar use, and to have a signification very similar to that it has with us.

This statute, so far from creating any new governmental division of the state for general purposes, (which it is said the legislature is not authorized to do,) merely enacts a law on one particular subject, for a district of territory embraced in four counties, limiting its operation to that district. If, from the general spirit of the constitution, a negative is to be implied on the power of the legislature to make new governmental departments, or divisions of the state, the principle has no application to a case like this. This act is not within the spirit of the argument on that subject. The district created by it is but a section of territory of the state, designated and distinguished from its other territory only for the purpose of the application of this law, and in no just sense a governmental district; which is the only kind of division to which the reasoning of the plaintiff is applicable.

The second objection to the constitutionality of the law—that based on the idea that vesting the power of appointment to these offices in the general executive of the state, is contrary to the spirit of decentralization pervading that instrument—has been carefully considered. That spirit does appear, on examination of the instrument, to have been active in giving direction and tone to the legislation embraced in it. As to local

offices, they being usually, if not always, for some general gov-
ernmental district of the state, they are very generally filled
by election or appointment in the district for which they are
constituted. Those for counties, for instance, are very gener-
ally filled by appointment or election within the county. A
county is a general governmental division, the largest known
in our state. It has appropriate officers for transacting its·
own business. Its clerk, supervisors, sheriffs and other officers
are ready for use for the purpose of conducting an election or
making an appointment. It has a regular permanent organiza-
tion for its use, for purposes of the kind generally, whenever
action by it in such matters is called for; and as to such dis-
tricts, local election or appointment is practicable and conven-
ient. It has always at hand the machinery for making its own
officers, either by election or appointment, and the constitution,
in accordance with its general tone and spirit, provides expressly
(*art.* 10, § 2) that " all county officers, whose election or appoint-
ment is not provided for by the constitution, shall be elected by
the electors of the respective counties, or appointed by the
boards of supervisors, or other county authorities, as the legis-
lature shall direct."

Without pursuing the inquiry as to the extent to which the
constitution carries the theory of decentralization, and without
answering the question whether that spirit, as exhibited, is so
dominant as to control beyond the letter, so that, in the absence
of express provision on the subject, the legislature would be in-
hibited by it from conferring, on the general executive, the
power of appointment to offices like these, covering, as they do,
territory of greater extent than any general governmental
division of the state, and as to which local appointment would
seem to be impracticable, and local election, (to say the least,)
inconvenient, we proceed to an express provision on the subject,
which seems to us to control on this point, and save the neces-
sity of speculation as to the spirit of that instrument. Art.
10, sec. 2, after providing for the election or appointment of all
county, city, town and village officers whose election or appoint-
ment had not been otherwise provided for, proceeds as follows:

The People *v.* Draper.

"All other officers, whose election or appointment is not provided for by this constitution, and *all* officers whose offices may hereafter be created by law, shall be elected by the people, or appointed as the legislature may direct." Here is found express authority for the legislature to determine as to all officers whose offices should thereafter be created by law, whether they should be elected or appointed, and we think authority further to decide, *how* they should be so elected or appointed. Now, if these offices have been created by law, since the adoption of the constitution, this provision authorizes the legislature to direct the filling of them by election or appointment, at their pleasure. The act in question became a law ten years after the adoption of the constitution. The offices created by it, therefore, were created long after the date of the constitution.

But while, as has been said, it is very certain that these offices have been created (if they have any valid existence) since the constitution went into effect, it seems equally clear that they are not county, city, town or village offices, within the meaning of these terms as used there, and that the provisions in regard to offices of those classes therefore does not apply to them. What particular adjective would express the territorial extent of their jurisdiction, it is not, perhaps, easy to say, and it is not at all important for us to determine. The provision of the constitution just referred to, seems to us as broad and comprehensive as its terms import, and to embrace, literally, *all offices created by law after the constitution went into effect.* Nothing in the context suggests a more limited meaning, and the terms are too plain, and their meaning too patent, to call for construction.

But the plaintiffs insist that the offices themselves are not legally constituted. Their argument seems to go the length of assailing the entire validity of the offices, and disputing their legal existence. Without dwelling on the point, not pressed on the argument, that the existence of the offices is not properly in controversy here, where, for the purposes of this action, their existence is admitted, the reasoning on this point has already been mostly answered in the earlier part of this opinion, in considering the first point treated, relating to the territorial divis-

ion created by this act. But the duties of the offices, and the whole subject matter of the act, to wit, the administration of police, are said to be local, and in their nature properly matters of county or local cognizance exclusively; and hence, it is said that the creation of offices for this anomalous district is an evasion of the constitution, and in fraud of it. And it must be admitted that the discharge of this class of the duties of government has usually been intrusted to the county or locality; but this has been for reasons of convenience merely. There is nothing in the law on the subject, constitutional or otherwise, and nothing in the nature of police which renders its administration exclusively or primarily local, or limits it to the county or other district. No duty of the state or sovereignty is more general or comprehensive in its own nature than the duty of preserving the peace throughout its territory; of preventing crime, protecting the rights of persons and property, guarding the public health, preserving order at elections, and the other numerous duties provided for by this act, and enjoined on these officers. (11 *Peters*, 102. 33 *Maine R.* 560. 7 *Cushing*, ·86. 12 *Pickering*, 184.)

The right of the public, and of each citizen, to protection from the evils of lawless aggression, is a right directly against the sovereign power. Equally direct and immediate is the corresponding duty of the sovereign, and the fact that the state has been accustomed to bestow this protection, to perform these duties indirectly and through the instrumentality of its members or departments, does not diminish or show the want of power in the state to do it directly, when, in its judgment, it becomes necessary or expedient; nor is the duty of the state to its citizens, any more than the duty of one individual to another, discharged by simply conferring on its departments or agents authority to perform it. If they fail to perform it properly, (of which the state alone is judge,) it is the plain right as well as duty of the state to interpose, and directly, (*by its own right arm*, if necessary,) afford its citizens the protection and security which, as a compensation for the natural rights they as individuals surrender, and the pecuniary and

The People *v.* Draper.

other burthens they assume by becoming subjects and members of it, it has undertaken to guaranty them.

The other objection to the law, relating to the property of the city, in use for police purposes, it is not necessary to consider. The validity of the act, for the purposes of this case, does not depend at all on the validity of it in that particular feature. If it be invalid in respect to that particular provision, the rest of it is so little dependent on that, and is so capable of being enforced beneficially, and its general purposes attained without it, that the validity of the act generally would not be controlled or affected by a rejection of that part of it.

The conclusion, therefore, is, that the act in question, in its general features, is not repugnant to the constitution, and judgment for the defendants, on the demurrer, must be affirmed.

ROOSEVELT, J. The legislature, at its last session, urged no doubt by considerations of what was deemed sound public policy, determined to make an entire change in the local administration of the city of New York and the three adjacent counties. They accordingly passed an act, the general object of which is well expressed in its title: "To establish a Metropolitan Police District, and to provide for the government thereof." And the question is, can the legislature, under the present constitution, by a species of federative union, provide for "the government" of the cities and counties of the state, through the intervention of commissioners appointed by the central executive, and by the aid of deputies and subordinates appointed by such commissioners.

A preliminary difficulty will no doubt suggest itself to some minds not familiar with our legal history, in this seeming appeal from the legislative to the judiciary department. The point, however, has been long since settled. Constitutions, it has been held, are compacts or contracts, the parties to which are the people, in their sovereignty, on the one hand, and the people's delegated functionaries, through their oath of office, on the other. They are also powers of attorney, conferring authority but confining its exercise. As laws they are

supreme—they are the direct will of the people ; and as a consequence, they are higher than the will of the people's representatives.   They are a law unto the legislature itself, as well as the individual citizen.   As contracts, therefore, as delegations of power, and as statutes higher than acts of ordinary legislation, they are the subjects of judicial construction and of judicial action.   The judges, too, are specially sworn not only to interpret, but, I might almost say, right or wrong, to "support" them.   With the wisdom or expediency of a constitutional provision, the judges have no concern.   *Stat pro ratione voluntas populi.*   They are patiently and impartially to seek out the intent, and when found, to give it effect, even if it become necessary, to overrule a statute.   In case of conflict, one must yield—and of course the lower to the higher law.   And as with the constitution, so with the statute ; the court has nothing to do with its fitness.

The question, in either aspect, is not one of justice, or expediency or abstract right.   On all those considerations, the decision of the people in the constitution, and of the legislature in the statute, was final, and without appeal, except to the ballot box.   The legislature, however, went further.   They raised a question of constitutional competency, and decided it, as they had a right to do in the first instance, in their own favor, but subject to appeal, both to the ballot and the bench.   Such an appeal is now taken.   It is in the name of the people of the state, and is addressed to the supreme court of the state.   The attorney general, speaking, as he had a right to do, for the people, contends that the act is an unconstitutional usurpation, and demands that it be declared null and void.   The third article of the constitution declares that: "The legislative power of this state (giving no direct definition of the term) shall be vested in a senate and assembly;" a grant which, standing alone, all will admit to be sufficiently comprehensive to warrant the enactment of a bill simply creating a board of police commissioners, prescribing their mode of appointment, and defining their powers and duties.   But the grant does not stand alone.   It is accompanied or followed by numerous re-

The People *v.* Draper.

strictions, expressed or implied. And here it should be observed that restrictions do not necessarily require the use of negative terms. A positive direction to do an act in a particular manner implies and carries with it a prohibition against doing the act in any other or different manner. A constitution is not a thing of letters and syllables, but of ideas. It is to be liberally construed, with a view to substantial objects, and the convention that framed it is not to be treated as a mere *cantor formulorum.* The judges, in particular, should seek out and enforce the *spirit* of the new political testament of " which they are made ministers."

Among the implied restrictions of the constitution are those contained in the tenth article, which declares that all city and county officers, whose election or appointment is not otherwise constitutionally provided for, shall be chosen directly by the electors of the respective cities and counties, or appointed by " authorities thereof," as the legislature may direct. It will thus be seen that the legislature, although *allowed* in some cases an option between a direct and an indirect appointment of the officers of cities, was prohibited from transferring the power to the central authorities of the state. In the enumerated and of course most important instances, they were not allowed even this limited option. " Sheriffs, clerks of counties, including the register and clerk of the city and county of New York, coroners and district attorneys, *shall be chosen* (says the same article) by the *electors* of the respective counties." Decentralization, it will thus be seen, whether wise or unwise, is the principle clearly established, and its opposite is clearly repudiated.

But the legislature, it is contended, are only restricted in the cases of county, city, town and village offices ; they may, by law, create " other offices"—offices other than those enumerated and specially provided for, and may direct in such cases of created offices, that the incumbents " shall be elected by the people, or appointed," as they, the legislature, may deem most expedient. Such undoubtedly is the language of the constitution. And it presents, therefore, the question whether the newly

created commissioners, and their appointees are or are not, in substance, city and county officers? If they are, the legislature had no power to take the selection or appointment from the electors of the city or county and also from the " authorities thereof." As originally introduced, the bill, it is admitted, was obnoxious to this objection. It was confined exclusively to the city of New York, and yet the appointments, as now, were to be made by the governor of the state, who, although in one sense an authority of the city, is clearly not so in the sense of the constitution. That bill, however, yielding to the constitutional difficulty referred to, was abandoned by its authors, and the present, creating a board with jurisdiction over a district of four counties, substituted in its place. And the question is, can a bill thus confessedly framed to avoid constitutional difficulties, or, as the plaintiff's counsel contend, to evade constitutional injunctions be sustained by the courts?

It is a well settled principle, as already stated, in American jurisprudence, that where a constitution and a statute are in conflict, the latter must yield to the former—the lower to the higher law. And it is equally well settled, and was so, long before the adoption of the constitution of 1847, that an appeal in such cases, and in such cases only, lies from the legislative to the judiciary department. Such an appeal, it is presumed, cannot be taken away even by express enactment. For, although the legislature, under the new constitution, have power (*art. 6,*) to alter and regulate the jurisdiction and proceedings of the courts, it is only " the same power (in that respect) as they theretofore possessed."

To test then the validity of the present bill, let us take as an illustration the case of a sheriff. The governor of the state it must be conceded, could not be authorized by the legislature to appoint a sheriff either by that or any other name. Sheriffs, says the constitution, shall be chosen by the electors of the respective counties. An enactment, therefore, that sheriffs should from thenceforth be called marshals or commissioners, and that as marshals or commissioners, they should be appointed by the governor, would be clearly void. The mere ceremony,

The People *v.* Draper.

however high and however solemn, of a new baptism by the senate and assembly, would not save it. The constitution intended something more than a name. It required that certain functions of government should be discharged by certain local officers of local origin. It did not intend that the electors of the county should enjoy the barren privilege of choosing two syllables. What then, in the year 1847, was the legal and well understood acceptation of the term sheriff? Sheriffs or shire-reeves, as they were once called, are defined in the old law books to be the chief officers, under the king, of their respective shires, having the custody, keeping, command and government, in some sort, of the respective localities committed to their charge, with power to serve process, to return juries, to make execution, and to keep the peace. (*Coke Lit.* 168; *Dalt. Sh.* 5.) And to this end they might appoint as many deputies as they should think proper. (1 *R. S.* 378.) Such, in general, were the functions of sheriffs; and such, therefore, in making these officers elective by the people, were the functions which the constitution intended should be discharged by the immediate nominees of the local electors, as distinguished from the more remote recipients of central patronage. Do then the functions of the newly created and appointed police commissioners correspond, in their substance and general outline, with those above described as constituting the elective office of sheriff? With the exception of returning jurors and serving civil process, there is, in their general attributes no substantial difference. Nor is there any as to the power of appointing deputies, both superior and inferior, regular and special, under the name of the "police force, for the whole of the said the Metropolitan District." Their authority, it is true, is not confined to "county lines," and the deputy of one may act in either of the four counties. But it will hardly be contended that the legislature could, consistently with the constitution, take from the people the election of sheriffs, merely by creating sheriffs for two, or three, or even four counties, instead of one, and then calling them commissioners, and commissioner's deputies, instead of sheriffs, and sheriff's deputies.

Such a mode of evading a private contract no court could sanc-
tion. And if it be "the duty of the courts of justice," as the
revised statutes declare it shall be, in the construction of every
private written contract relating only to a mere foot of real
estate, "to carry into effect the intent of the parties so far as
such intent can be collected from the whole instrument," how much
more is it their duty to do so when construing and enforcing
the great contract which expresses the intent of the people on
the one side, and the obligations of their representatives on the
other, in regard to the entire government of the body politic?

I have referred, in the example cited, to the case of sheriffs.
They are properly elective officers of counties, and of the city
of New York only as a county. The objections stated will
equally apply to the case of city officers as such—the mayor,
recorder, city judge and chief of police and their subordinates.
The act in question, so far as relates to police administra-
tion, substantially nullifies them all. It ignores the recorder
and city judge, places five commissioners, appointed by the
governor, over the mayor to outvote him, and supersedes
the chief formerly appointed by the city "authorities" by
another chief called a "General Superintendent," to be ap-
pointed by the governor's commissioners. This is some-
thing more than simple evasion : it is absolute nullification of
the "electors of the city" and of the "authorities thereof."
It is a sort of political decapitation of both the people and the
people's functionaries. From the first meeting of the new
board, (sec. 31,) all the power and authority before conferred
by law upon the old board, or upon the mayor, recorder and
city judge as police commissioners, or upon the mayor, as head
of the police department, or relating to police government ap-
pointments, or discipline, is conferred upon, and of course trans-
ferred to, the new commissioners of the central power. All the
subordinate police officers of the city, therefore, from the gen-
eral superintendent under the commissioners down to the
humblest doorman, with salaries in the aggregate amounting to
more than a million of dollars, and varying from three thousand
each to as many hundreds, instead of being appointed, if ap-

The People *v.* Draper.

pointed at all, by the authorities of the city, as directed by the constitution, are henceforth to receive their commissions on the fiat, indirectly, of the executive of the state. In other words, they are to look to Albany and not to New York as the source of their political existence. The authorities of New York—the authorities chosen by the votes of the electors of New York—the mayor, recorder and city judge designated by a previous constitutional statute for the purpose of making all the subordinate appointments in the police department of the city, are thrust aside and the organs of the central power installed in their stead.

If by the mere contrivance of a junction of two counties, or even of one county and the minutest possible fragment of another, such a result may be accomplished, the 10th article of the constitution, so pregnant with the spirit of the whole instrument, to say nothing of other leading provisions, becomes a dead letter. And why, by the same process, might not the selection of the chief state officers, the secretary of state, comptroller, treasurer and attorney general, be taken from the people of the state and conferred, as many think it ought to be, upon the governor of the state? A cabinet might be organized, consisting of a president of the council, a first minister of the treasury, a state banker and a solicitor general—all to be appointed by the executive, and all to possess together powers nominally different from, but really equivalent to, those now vested by law in the elective state officers named in the constitution. Those officers, or rather their official names, would, from necessity of course, remain, but only to say of themselves, "What shadows we are and what shadows we pursue." And wherein would such a law, so far as principle is concerned, differ from the one under review? Unless in this, that it would, in a constitutional point of view, be the less objectionable of the two, as only transferring the appointing power from the people of the state to one of the elected authorities of the people of the state, whereas the new police law not only transfers to the central executive the appointing power of the people of the counties, but of the "authorities" elected by the people of the counties. It frustrates, if effectual, not one, but two leading

purposes of the constitution—it both centralizes and depopular-
izes instead of popularizing and decentralizing.

The whole case then resolves itself into a single inquiry : If
a private citizen cannot, by any shift or contrivance, evade the
lawful will of the legislature, can the legislature itself, by any
like shift or contrivance, however desirable the object may be,
evade the constitutional will of the people, the sovereign alike
of the legislature and of the courts.   I do not mean by this sug-
gestion, to intimate that the members of the senate and assem-
bly, in adopting the new police bill, had any actual intention of
evading the implied prohibitions of the constitution.   Judges,
I know, have sometimes (both in and out of legislative halls)
been charged with that sin ; and the history of English statu-
tory jurisprudence contains several noted examples to illustrate
the occasional justice of the accusation.   But no such *intent*
can be imputed to legislators.   We may say, however, without
offense, that the effect of the act under consideration, if carried
out, and if the views I have expressed are correct, would be
the same as that of an intentional evasion, and would render one
of the prominent articles of the constitution, to say nothing
of the entire scope and spirit of the whole instrument, no
better than an idle formulary—*vox et preterea nihil.*

### CONCLUSION.

*First.* The general purpose of the new constitution is to popu-
larize, as far as practicable, and in every event to *decentralize*
power.

*Second.* The extent of that purpose, as the defendants'
counsel admit, and the manner in which it is to be executed,
are defined by the text of the constitution itself.   It makes
the great state officers elective by general ticket ; it makes
the entire legislative force of the state elective ; it makes the
entire judicial force of the state elective ; it makes all the
enumerated county officers elective ; and all county and town
officers not enumerated, elective, except as the legislature may
direct them to be appointed by the local authorities.   It leaves
all village and city officers to be elected at large or by divis-

Everett *v.* Vendryes.

ions, or to be appointed by local authorities, as the legislature may direct.

*Third.* The constitution does not say or intend that all officers whose offices may thereafter (constitutionally or otherwise) be created by law, shall be elected by the people or appointed as the legislature may direct, but all officers "other" than county, city, town and village officers, and, "other" than the specially enumerated state officers. Although, therefore, the legislature may have the power to create a new county or city office, it has not the power to render such office, when created, the subject of executive appointment. The constitution is peremptory that "all" such officers shall be either elected by the voters of the respective localities, or "appointed by the authorities thereof."

*Fourth.* The legislative department, like an individual citizen, cannot do indirectly that which it is prohibited from doing directly—it cannot, by uniting counties, divest the "authorities thereof" of their constitutional jurisdiction and transfer it, under another name, to the central executive. Such a consolidation is at variance with the letter, and with the whole scope and spirit of the constitution, the favorite purpose of whose framers, wise or unwise, was to erect, not a consolidated, but a quasi confederated government.

Judgment affirmed.

[NEW YORK GENERAL TERM, May 25, 1857. *Mitchell, Roosevelt* and *Peabody,* Justices.]